Thank you please be seated. Good morning, welcome to the Ninth Circuit Court of Appeals. My name is Morgan Christen. I'm one of the Circuit Court judges and my chambers are in Anchorage, Alaska. I have the pleasure this week of sitting with two of my colleagues from the Circuit Court, Judge Clifton, whose chambers are in Honolulu, and Judge Tallman, whose chambers are in Idaho, Portland, Idaho. I'm not quite used to that yet. We have three cases that are submitted on the briefs today and I'll just read those first. Both we will not be hearing argument in the following cases. 24-1285 Goat-A-Ten, 24-2031 Elaria v. State Farm, and 24-5958 Kamal v. United States District Court for the Southern District of California. The first case on the oral argument calendar is Casillas v. Clark, 23-2213. Counselor, if you'd just give me one minute. You're welcome to come up to the lectern. It's just going to take me one second to get myself situated here. Okay, I'm all set. Good morning, Your Honors, and may it please the Court, Dan Ogden for Marco Casillas. I'm going to try to reserve two minutes of time for rebuttal and I'll watch the clock. There is strong evidence that someone else committed this murder, but Mr. Casillas, as he stood charged with that murder, could present none of it. Well, Counsel, the trial court convened a mid-trial hearing, an evidentiary hearing, did it not, in order to test the reliability and admissibility of the proffered evidence? The pretrial, but yes, I could explain that because there were two sort of separate proceedings. Well, I guess my question really is, if the trial court conducted an evidentiary proceeding and made findings that the evidence was inadmissible under any recognized exception to the rules against hearsay, and also unreliable, how does that amount to a due process violation? Part of the problem, Your Honor, is that the hearing you're referencing just focused on Miller and the letter that Miller wrote alone, and didn't look at all the corroboration. Because before that, there was a hearing on a motion to dismiss for destroying exculpatory evidence, where DA Investigator Volpe testified at length to why he believed Raymond Perez murdered Jake Bush. And defense counsel had proposed admitting this evidence through quite a bit more than just Miller's letter. But then the court said something to the effect of, it's in footnote 1 of my brief, because no rule of evidence would allow Volpe testifying as investigational. Volpe would essentially be testifying to hearsay statements that were made to him by Miller, in large part, would he not? Well, Volpe could have authenticated a number of other things beyond Miller, right? Like what? So, for example, a lot of Raymond Perez's conduct, like upon his arrest and his escape from custody, his paranoia about being investigated for the murder, his seeming knowledge of the murder, all those things Volpe could have authenticated. But they're statements against Perez's interests, so he would have been able to lay that foundation. So here's my problem with this. I think Judge Talma may be going to the same thing. I think I take your point regarding chambers and third-party culpability evidence, and how important your client viewed that evidence. But even with that, I think there are some circumstances, and it's pretty well established, that evidence could be properly excluded. We wouldn't find error as a matter of just looking at the evidence code, and due process could be violated. It didn't happen very often. But pursuant to the chambers line, I think I'm not pushing back on that, is what I'm trying to say. I'm not pushing back on that. But those cases involve evidence. I think Judge Talma's going right to it, that the excluded evidence has real indicia of reliability. So it's very unsettling that the jury never heard it, right? And we really look at, was this trial fair? And it seems to me that's the nub of this case. So it's very important to figure out whether this excluded evidence was reliable. Never mind that it's hearsay, right? You said there's another reason to think that it was very reliable. But Miller had all kinds of reasons to say, right, that he was in jail, that he was doing deals, that he doesn't even remember. He said, that looks like my handwriting. I can't even tell you. So right there, if the declarant can't say that it's reliable, and actually gives us a lot of reason to think it's not, it's a very steep hill. So what's your best shot? So I think this is the core of the problem I have with the California Court of Appeals decision, is that they were just looking to Miller and his testimony alone. What this court's decision in Lundner tells us is we look at all the circumstances surrounding that. So I think the biggest indicia of reliability are all the corroboration that that note had, right? For example, the letter details that Perez had jewelry hidden in the closet and detailed his escape. What if he testifies? So to just finish that, you're thinking that the letter, that he knew stuff he wouldn't have known if he hadn't been there. Is that the gist of it? Yeah. Then that's what this court in Gable says. You know, when it's nonpublic, that's a big deal. Okay. But the nonpublic was the jewelry? Well, I think the – I'm sorry, Your Honor. No, jewelry from the home invasion, the stabbing in the closet. Are those the details? And the escape, yes. All of those details were nonpublic is what Gable says. What about the forensic evidence? I mean, clearly the trial court was aware, was it not, that not only was there a DNA match to the feces in the clothes basket in the closet, but also palm prints that clearly put Casillas at the scene. And then we have the witness testimony from the neighbors who saw the suspect about 15 minutes before police arrived in response to their 911 call. I mean, isn't that pretty strong evidence that he was there at the time the stabbing occurred? So I think that's precisely why I think this is prejudicial, because that is the overwhelming majority of the state's case, is that Casillas was there. Casillas, as he had to, conceded he was there at some point that day, right?  But the – oh, sorry. I was saying his defense was pretty shaky in the face of this forensic evidence and the eyewitness testimony. Well, I mean, as far as forensics go, I think that's the importance of this evidence, is to establish somebody else was there. There were unidentified prints that they couldn't – But how does that help your client? Maybe he was there alone. Maybe he was there with someone else. He wasn't just there that day. I understand his alibi to be that he went there intending to break in, then he left, and the others must have come back. He wasn't just there. He was in the closet, or at least there's very strong evidence that he was. So how does it help your client if someone else was there, too? Well, that – Maybe somebody else did the stabbing. It gets to be really attenuated. That's the problem we've got, right? Well, that closet has the unidentified print on there, right, that didn't belong to Casillas or anybody in the household. And I think that's what happened right at the – Off the window sill, where the – Casillas' palm print did, yeah. The unidentified one. So where were the unidentified prints? On the closet? That's my understanding. I tried to draw a map of where this all was, because there's not many exhibits in the record. But my understanding was it was on that closet door was the unidentified print confined. Do you have the ER site? I have a few. It's one of these. That's fine. You can – Eight ER 1564 to 65. 1564 to 65, okay. And then nine ER 1630 to 31 and 34 to 35. It's in one of those. I believe that's what they're talking about there. Okay. But I think that's why this is prejudicial, is because Casillas had to explain that somebody else was there. That was the only defense that would have made sense. We didn't have a specific interrogatory finding by the jury that he was the killer, do we not? That's because they were never presented with Raymond Perez as the alternate suspect, right? As this case talked – as this court has talked about in Gable, Lundberg, and Bradford, right, if Casillas didn't do it, who else did, right? That's the prejudice, is when the jury doesn't hear that, who else? Well, we don't have anything that links anybody else to the scene other than unknown fingerprints, and who knows where those could have come from. Well, I mean, I think, again, the corroboration of Miller's letter, Raymond Perez's converse not works very much if the witness can't authenticate it and basically explains the content by saying, look, I would tell police anything to get out of the jams that I was in. I was making this stuff up. Well, let me take a step back and then address some of what I think the other corroboration is, if that's okay. I think there's a subsequent recorded conversation with Russell Scott, who was Raymond Perez's lookout, right? And Miller – His dad, too, right? He died early on. Raymond Perez died 2015, 2016, something like that. But, you know, Miller detailed that Scott was the lookout, and then when we have this recorded wire conversation with Scott, Scott just so happens to know about this murder, right? Again, he knows none of the public details. Perez himself is picked up for a minor marijuana charge and escapes because he's paranoid about being questioned for the murder, right? His co-arrest – Well, he escapes, but I don't know about the because he was paranoid. He does actually explain that's why he did it in the second interview after he's rearrested. And Volpe points this out, is this one escape is extremely rare, to escape through the ceiling of a police department. I've never seen it either, your Honor, yet. But it doesn't make sense if it was just that marijuana charge, right? People don't do it for that reason. And then when he – What he said was that he thought they were going to try to pin it on a member of that gang, right? He thinks they were going to pin it on him. He also mentions the crazy white boy gang. But then when he was arrested the first time, he has a knife that says CWB standing for the crazy white boy. So he clearly knows about this murder. One witness saw two men the days of the murder, right? One of them being white, which lines up with the idea that Russell Scott was along with them. Perez's girlfriend suggests she has his corroborating information. I ask you, did the jury hear about the other fingerprints? They heard about the unidentified prints, but that was it. Is there some reason that Foltby did not know about the forensic evidence that was lifted or taken from the crime scene? I found that to be very odd in a DA investigator doing a follow-up investigation. Oh, I believe that's because he was on the case early on, but a lot of the forensics comes to light as forensic science develops, right? This is a 20-year cold case murder. So he knew about the physical collection of the samples from the crime scene. Why did he not know that they were linked later to Casillas? Well, I'm sure he subsequently did once he was put on the stand and saw that somebody else was. But he didn't know at the time of the investigation. But I do think that should give this court a little pause. A DA investigator believing somebody else committed the murder is a very unusual set of circumstances. I'm sorry, I see I'm over time, Your Honor. No apology needed. When you come back, we'll put another minute on the clock. Thank you, Your Honors. You bet. Good morning, Your Honors. May it please the Court, Deputy Attorney General Louis Carlin for responding. I just want to pick up on a few things that were just said. Foltby's opinion as to who committed the crime is of almost no value because at the time he made that statement, and this was adduced in a pretrial hearing before this court, Foltby did not know of the DNA evidence. He did not know of the palm print. But counsel says that just because it was years later that the match occurred as the technology proved. And that's exactly right. But when Foltby is asked, did you believe that Perez committed the crime, he didn't know that stuff. So his opinion might well have changed if he knew. So in addition, I want to make clear that there are no statements by Mr. Scott. Every single statement comes from Miller. When Miller was wired to get the conversation with Scott, Scott wouldn't talk to him, so Miller had to call him. All the police got was Miller's statements. And when they debriefed him as to every statement made by Scott, it was through Miller. So that's why the focus had to be on Miller's reliability. And as far as nonpublic facts, it's important to point out that there are very few. I mean, the court mentioned jewelry. Well, true, earrings were taken, among other things, but the statement was jewelry. It wasn't even earrings. It's residential burglary. It's hard to imagine one that wouldn't have jewelry stolen, and it's just jewelry. I have a question about this, about the corroborating evidence. There's a discrepancy about what happened to the knife, right? It wasn't one knife found in the neighborhood, and one indication from Miller that the knife was thrown into the river or thrown away. Right. Okay, so in the three-page statement, the statement is false. He says the knife was thrown in the ocean. It's incorrect, right? Knives found in the neighborhood have cotton fibers that match the T-shirt. Exactly, blood, yes. So when you say it's false, I don't know if you mean, I'm not sure what you mean by that, but what you're telling me is there's good reason to think that was wrong. So it's not corroborative, right? It's not corroborative because it conflicts with what we actually know. But what if there were two assailants and two knives? There's no evidence of a second knife. Well, there's evidence, that's his theory. His theory is that somebody else was there and that there were two assailants. Right. So if we think about this in terms of Brecht, you know, say this came in. Yeah. To call it a hard sell would be an understatement. There's a very small window. But isn't that because of the fecal matter in the closet? I mean, the rest of it seems to me to be, I understand. I mean, it seems like he's got an argument that I can connect the dots to except for that. So it would have to be that Mr. Casillas broke into the window, left his palm print, deposited the DNA. No, I'm saying but for that. But for that. When you get to Brecht, it seems to me that the DNA from the evidence in the closet is devastating. Right. But for that, it seems to me that his argument would hold together that there were two people in the house. There's no affirmative evidence of two people. It's possible. Well, there's unidentified fingerprints. He's got that. Right. But it's a residence. But yes. So the problem is the time window. It's very small. It's like an hour and a half to get back around 1030. We know when the mom and victim left and came back, yes. So when they left early in the morning, they arrived back around 1030. There was nothing disturbed when they first came back. So when they come back the second time, so all you've got is from, I think, 1030 to maybe 1230 at the most. So in that time. And we know it has to be fast because the paw print would have dried up because of the sunlight, and the fecal matter was still warm. So the idea would be that he left and then someone else climbed through the window. It's a very tight time frame. We have a pretty detailed timeline. Can I shift gears and ask you to speak to Andrew, the recent Supreme Court case, and the state's position on whether or not there's clearly established law that would support this claim? There is clearly established law. I don't think Andrew really adds anything to it because you have a long line of clearly established Supreme Court precedent, which is that he's relying on Chambers versus Mississippi, and I just want to make sure that that's not contested. Is that correct? Correct. We're with the Chambers-Holmes frame. So your position is that Andrew doesn't change anything? Correct. Okay. And the key point is that the through line with all those cases is that the defense evidence must be reliable, must be trustworthy, and then you have an arbitrary or mechanistic application of the law to exclude trustworthy evidence. Evidence that leaves us with real doubt about the fairness of the trial. Exactly. And we still have the open question that the Supreme Court has never decided about whether a trial court's exclusion of evidence pursuant to an otherwise valid evidentiary rule can violate a defendant's constitutional rights. That's correct, Your Honor. That's open. The nice thing about this case means you don't have to reach it because the application itself was so reasonable. You had about 58 pages of pretrial testimony, back and forth, cross, recross, reexamination, and the court's own examination of Miller to find out is there any basis that I can believe. So past recollection recorded is the hearsay exception. One of the necessary components, one of the four necessary components, is that the maker of the statement will testify that the statement was true when made. And Mr. Miller resolutely refused to do that. Can I get it really clear?  Please. One of the problems I've had looking at this case is Miller's willingness to say whatever he thinks is going to be convenient at the time. One of our retired colleagues, Steve Trott, used to lecture, a former prosecutor, used to lecture about how it's tough to trust criminals because they're criminals and they're not honest. And I look at Miller, and Miller's busy saying, Now, I don't remember anything about that. I was willing to say anything. But why do we think that's trustworthy? Well, can you believe his denial? Right? So the thing is that for, so you have to get a, for, we understand, okay, he says, I don't remember saying any of it. So you can't, it can't come in as a prior, in order to impeach the prior statement that he made. So, because he doesn't remember it at all. So the only avenue really is the past statement recorded. So why is that? That's a great question. I'm thinking about our standard for the ability to present an offense, the trustworthiness of Chambers. And I guess it's hard to say that at any point in time you can decide anything he says is trustworthy. But it is troubling that his current denials may well be geared at helping his current situation. I mean, he's not in the situation he was many years ago when he was trying to suck up to somebody who's no longer an investigator for the DA. So, I get the main thrust. But it also concerns me somewhat that we are promising the untrustworthiness or the un-admissibility of the letter based on what he's telling us now when I've got no confidence that what he's telling us now is truthful. Well, two things. One is that there are non-public facts that are contradicted by all the evidence. But the other thing is, I mean, the court is left with statements like, where Mr. Miller says he was taking Mr. Volpe for a ride regarding this case. And the court followed up on that. Does he know what taking, do you understand what that means, that phrase? He says, yes, I do. And I probably lied to him referring to Volpe when he was asked about the statements. Asked if he really heard the confessional statements by Perez or Scott, Miller said, I might have, but I don't exactly know what was true and what wasn't. I probably ran with whatever I heard and twisted it for my own benefit. When he was specifically asked if he told Volpe that Perez said he killed Jake Bush, he said, I don't remember telling him that. So the superior court is left in a situation where there's nothing for him to hold onto in order to make a finding, a threshold finding, that this is something the jury can rely on. And your point is that for 58 pages of testimony, including director cross-examination, the trial court was in the best position to assess the reliability of Mr. Miller. Exactly, Your Honor. And the court made it very clear, I understand this is a threshold determination. The last thing I'm going to do is take a credibility determination away from the jury. But this is basic, basic responsibility of a trial judge to make sure that there is baseline threshold reliability under the rules of evidence. Counselor, your time's up. You've exceeded it, but hold on. I just want to make sure, if I could, please, get your statement about what it is you think it remains after Andrew. Because I think I answered my question about clearly established law one way, and then I'm not sure that I followed your response to Judge Coleman's question. So what is it you think that remains an open question? Yes, Your Honor. So in all, in this line of authority from Chambers and Miller. Counselor, you're out of time. Okay, just a moment. What is it you think remains open, please? The distinction between an arbitrary mechanistic rule, on the one hand, and application of a rule that fits, that is not arbitrary, a rule like this. Can the application by the trial judge be mechanistic, arbitrary, such as to violate the right to present a complete defense? So by that, do you mean it's not a per se reversal rule, just because the defense says my complete defense was cut off, therefore it must yield to my right to bring in whatever I see fit? The court still has an obligation to determine the trustworthiness and reliability of the evidence, which is what happened here. Which is what happened here. So, yes. Before we declared there was a due process violation. That's correct. In excluding the evidence. Yes. Okay. But your contention is not that it's an open question. I don't think you're saying that it's an open question, that if we have a Chambers scenario where a rule of evidence is applied correctly, or at least within the strike zone for purposes of state law, that that could nevertheless violate due process, if otherwise reliable evidence is excluded, so that we have a real doubt about the fundamental fairness of the trial. Right. Or else what Chambers was. And it seems to me I've tried to be really transparent about this. I think the difference between this case and Chambers is not the rule of evidence, it's that there's real reason to think that this excluded evidence wasn't reliable. Well, yes. That's what happened here. But the distinction, as I understood, at least my understanding of what you were getting at, is that the open question is, on the one hand, Chambers had a rule of evidence that on its own is indefensible. It's based on. So, your position is that we would have to have that as a prerequisite. Correct. All right. Thank you. Now you're way over time. But thank you for your patience with my questions. Thank you, Your Honors. Judge Clifton, to a point you made, and to paraphrase one of your opinions, that everything has been said, just not everyone has said it. Right? I remember that clearly. I used the quote, yes. I think this is pretty well-trod territory, right? When you exclude evidence of third-party culpability that just leaves this one defendant in view and the only defense is that somebody else did it, that's when this right is violated. That's when it's prejudicial. Well, it could be. So, can we get back to this? I understand absolutely why you want to place another person in the house. But as I said, my problem with this case, if I want to give you a chance to respond to this, it's the timeline. Your client's alibi, as I understand it, is that he concedes that he went to the house with the intention to authorize it. He changed his mind. He says that he left. But he says he was there that day, and the question is sort of when. And then there's this DNA evidence from the closet. And so, even if someone else – and we know, I think we know, we have evidence from the mother, that when this child was stabbed, she came in and she said he's just run out of the house. The strong implication is that the murderer was in the closet. Do you agree with that? That the murderer had jumped out of the closet? Yeah. Right? Right. I think that's what we, you know, Perez did. Yes, and so even if there was somebody else in the house that day, it seems like it would have to have even been the first trip if there had been an aborted burglary to get into this graphic detail because the fecal matter was still warm. So it becomes just really almost vanishingly remote, and I want to make sure you tell me what I'm missing in that timeline. I see. Okay. It was a two-hour window. They come back around 10. Jake Butcher stabbed around noon. What happened from our perspective is that they go there. They look around for houses to burglarize. They see this house. They both get in. Then Raymond Perez and my client.  Then what happens is there's deadbolts that are locked from both sides, so they can't leave through the front door. So my client says, well, we can't carry anything. We just have to jump through the window. So he wants to leave. They do leave. He drops off Raymond Perez, and then Russell Scott was there with him. So I don't think it's. . . So in your client's story, I don't mean that pejoratively, his version of events is that they must have gone back and committed the crime. Yeah. The murder. Well, yeah, Perez. I mean, and, you know, again, we have Russell Scott acting as a lookout, and this man just so happens to know about it. How long did it take for the police to get there? I thought the patrol was. . . Five to ten minutes. It was quick. I thought the police officer was a mile away when he got there. It was quick. It was down the street from the courthouse. He was on a motorcycle. He got there pretty quick. Yeah, yeah. So that's the problem I've got. I'm just submitting that I think this is actually a two-hour window. I don't think it's as tight of a window as the state wants to make it here. But we have to view the evidence in the light most favorable to the prosecution, do we not? No, because that would be a sufficiency type of claim. The problem here. . . If that claim was rejected on appeal to the California court. . . Certainly, we don't have that. What I'm saying is I think that's sort of a similar mistake that the South Carolina Supreme Court made at Holmes is they just kind of looked at the prosecutor's evidence, right? The problem is that they threw out our evidence. Can you go back to this? How is this a two-hour window? The police got there. . . We know, again, I apologize for the graphic detail, but the fecal matter was still warm, and the police got there right away. If your client's alibi is the one that you want us to entertain as third-party evidence that was prejudicial to him to have. . . It seems to me very unlikely, because his version of events would have him leaving certainly an hour earlier. About an hour, I think. Something like that, yes. As long as I'm not misunderstanding the time. Well, I guess I would say if the problem is. . . I'm sorry for the graphicness, too. It sort of is what it is. If the problem is the warmth there, we don't really have a lot of detailed description as to how warm or things like that. How warm was the house? Was it a hot day? Well, it was in the summer. I mean, it was late June. But this is the problem to me is that we can sort of poke at the details, right? But at the end of the day, we're talking about whether the jury should have even heard this at all. But the witnesses saw the strange man shortly before. . . Did they know that? Well, the two girls who were. . . The two girls who were there. The two girls who. . . Yeah, so the only one who thinks she can make an identification is Semchenko. Right. And her detail. . . I mean, I detail this in the uncertified claim. There's a lot, I think, there is to her unreliability. Again. . . That is the novel aspect of it. I agree that's the legal issue here. But I was just saying I think I detail a lot as to why her identification is so problematic there as far as the strength of the case. Thank you very much. Thank you both for your argument. We'll take that case under advisement and move on to the next case.
judges: TALLMAN, CLIFTON, CHRISTEN